# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **LINDA MALLERY MCLEAN,** | Case No. 3:15-cv-654-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **PINE EAGLE SCHOOL DISTRICT, NO. 61; JOHN MINARICH, MARK BUTLER, WILLIAM JOHNSON, DAVID SCHMITT, DWIGHT SAUNDERS, ROBERT SEAL, MICHAEL CORLEY, CAMMIE DECASTRO, and SHAWN THATCHER, in their individual and official capacities; and ALPINE ALARM COMMUNICATIONS AND CONSTRUCTION, LLC, an Oregon limited liability company,** | |
| Defendants. | |

Ralph E. Wiser, One Centerpointe Drive, Suite 570, Lake Oswego, OR 97035; Roderick Boutin, BOUTIN & ASSOCIATES, PC, 5005 Meadows Road, Suite 405, Lake Oswego, OR 97035; Cody Hoesly, LARKINS VACURA KAYSER, 121 S.W. Morrison Street, Suite 700, Portland, OR 97204. Of Attorneys for Plaintiff.

Karen M. Vickers and Blake H. Fry, MERSEREAU SHANNON LLP, One S.W. Columbia Street, Suite 1600, Portland, OR 97258. Of Attorneys for Defendants Pine Eagle School District, No. 61; John Minarich; Mark Butler; William Johnson; David Schmitt; Dwight Saunders; Robert Seal; Michael Corley; Cammie DeCastro; and Shawn Thatcher.

David R. Auxier, COUGHLIN & LEUENBERGER, PC, Post Office Box 1026, Baker City, OR 97814. Of Attorneys for Defendant Alpine Alarm Communications and Construction, LLC.

**Michael H. Simon, District Judge.**

In this case, a former elementary school teacher is suing the school district where she previously worked, as well as several district administrators, employees, and school board members. She also is suing a private company that is co-owned by the chair of the school board. Plaintiff's school district held an in-service workday for teachers on April 26, 2013. Plaintiff was at school, working alone in her classroom. Most students were not at school that day.

On the afternoon of April 26, several of the Defendants participated in an "active shooter drill" at the elementary school where Plaintiff was working. None of the teachers, including Plaintiff, were given any advance warning. Two men entered the school building. One of them lit firecrackers inside the building. The two men were wearing masks and disguises to hide their identities. They each carried a "starter" pistol. One man walked down the hallway leading to the library. The other walked down the hallway leading to Plaintiff's classroom. He entered and found Plaintiff alone.

Once inside, the masked man pointed his "starter" pistol directly at Plaintiff. He pulled the trigger. The pistol was loaded with .22 caliber blanks. Pulling the trigger caused a loud noise, which sounded like a gunshot. Smoke came out of the gun. The masked man said to Plaintiff, "You're dead." He ran away.

Plaintiff claims that as a result of what happened during this unannounced active shooter "drill," she became distraught, shaken, and mentally, physically, and emotionally ill. In this lawsuit, she alleges four claims for deprivation of her federal constitutional rights and two state common law claims, intentional infliction of emotional distress and civil assault. All Defendants have moved for summary judgment. For the reasons that follow, Defendants' motions are

granted in part and denied in part. Plaintiff's constitutional claims are dismissed, but she may

proceed to trial on her two state law claims, at least against several of the Defendants.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252,

255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

Pine Eagle School District, No. 61 ("Pine Eagle") is located in Halfway, Oregon, in a

rural part of the state. Halfway has a population of 286. Emergency response times can take more

than an hour.

Linda Mallery McLean ("McLean") is a former elementary school teacher who worked

for Pine Eagle. In addition to suing the school district, McLean is suing several of its

administrators, employees, and school board members. The administrators and employees being

sued by McLean are: Michael Corley ("Corley") (Superintendent of Pine Eagle), Cammie

deCastro ("deCastro") (Principal of Pine Eagle's elementary and high schools), and Shawn

Thatcher ("Thatcher") (school safety officer and maintenance person for Pine Eagle). The two

school board members sued by McLean are: John Minarich ("Minarich") (Chair of the Pine

Eagle school board, and also President and co-owner of Alpine Alarm Communications and

Construction, LLC ("Alpine Alarm")); and David Schmitt ("Schmitt") (member of the Pine

Eagle school board). McLean also is suing Alpine Alarm.[1]

On December 14, 2012, at Sandy Hook Elementary School in Newtown, Connecticut, a

lone gunman fatally shot 20 children ranging in age from 6 to 7 years old, as well as six adult

staff members. One month later, on January 14, 2013, the Pine Eagle school board met. Principal

deCastro reported that she had recently spoken with school board Chair Minarich, who pointed

out that in light of the recent events at Sandy Hook, "notification is very important, and the

[school's] communication system is lacking." Minarich told the school board that he was a

professional in emergency situations, saying "It's what I do for a living." Minarich then

suggested that the Pine Eagle school district needed a committee to look at safety options. The

school board approved the formation of a Safety Committee to formulate policy for an

emergency response to an intruder (or active shooter) situation. Minarich volunteered to serve on

that committee and asked for others to join him. Board members David Schmitt and William

Johnson and Principal deCastro all volunteered to join Minarich on the Safety Committee.

Shortly thereafter, Pine Eagle's safety officer and maintenance person Shawn Thatcher joined

the Safety Committee.

---

[1] McLean also originally sued school board member Krista Dennis, but later agreed to dismiss Dennis from this lawsuit. ECF 15. McLean also sued the following Pine Eagle school board members, in addition to Minarich and Schmitt: Mark Butler, William Johnson, Dwight Saunders, and Robert Seal. In response to Defendants' motions for summary judgment, Plaintiff conceded that these four Defendants "had nothing to do with the active shooter drill." ECF 38 at 57 n.2. Accordingly, the Court dismisses Butler, Johnson, Saunders, and Seal from this action.

On February 4, 2013, Safety Committee members Minarich, deCastro, and Thatcher, along with Superintendent Corley, attended a presentation in Baker City, Oregon on the "Run, Hide, Fight" recommended response to active shooter incidents. This presentation did not include any training for active shooter drills. On February 11, 2013, the school board met. They were told about what had been learned at the presentation the previous week.

The school board next met on March 11, 2013. Principal deCastro advised that school staff, including teachers, soon will be attending a presentation in Baker City on the "Run, Hide, Fight" recommended response. They were told that after a Pine Eagle teacher attended a training session, the administration required that attendee to develop a written safety plan for his or her classroom, implementing what had been learned.

Also at the March 11th school board meeting, school safety officer Thatcher told the board that he had spoken with Alpine Alarm (Chair Minarich's company) "to explore costs to implement security measures for the school," including "communication options." Alpine Alarm is a small business that installs and services security systems throughout Oregon and Idaho, including for school districts. Minarich is the President and co-owner of the company. Minarich's wife is the Vice President and also a co-owner. Shortly thereafter, Minarich submitted an estimate for the cost of upgrading Pine Eagle's security system. The school district, however, decided not to upgrade its system at that time.

On March 14, 2013, McLean and other Pine Eagle teachers attended the "Run, Hide, Fight" presentation in Baker City. The presentation consisted of a lecture, a video, and a question and answer period. The presentation did not include training on active shooter drills.

After the March 14 presentation, the members of the Safety Committee—Minarich, deCastro, Thatcher, and Schmitt—planned an unannounced active shooter drill to take place at

the Pine Eagle elementary school on the afternoon of April 26, during a teacher in-service workday, when no students were expected to be present. That was also the day that the teachers' written safety plans were due.

Minarich, deCastro, Thatcher, and Schmitt intended the drill to simulate a response to an active shooter intrusion in order to test the teaching staff's "Run, Hide, Fight" responses. Minarich testified during his deposition that the purpose of the drill was "[s]ituational awareness, policies, making sure that the staff was following the training, the run, hide, fight, trying to verify whether doors were locked, was there easy egress." ECF 35-5 at 22. According to Principal deCastro, a teacher fighting back would have been among the several possible successful responses to the drill. Additionally, Schmitt testified during his deposition that he continued to be supportive of the drill, even though he knew that a teacher could have fought back, including by using a sharp weapon. ECF 38-1 at 272. Minarich, deCastro, Thatcher, and Schmitt did not have any training in planning or conducting an active shooter drill. None made any inquiries or conducted any research regarding how to conduct an active shooter drill safely. Thatcher, however, advised the local sheriff's office and emergency dispatch center that an active shooter drill was going to occur at Pine Eagle on April 26. Neither Thatcher nor anyone else, however, advised any of the teachers.[2]

On April 18, 2013, Principal deCastro sent an email to the Pine Eagle staff asking each teacher to develop a "Run, Hide, Fight" plan for his or her classroom. She instructed that the plans should address possible classroom exit routes and items that may be needed for safety kits. She requested that the teachers submit their written proposed plans on the morning of April 26.

---

[2] Safety Committee member and school board member Johnson did not participate in planning the drill, and he did not know about the drill until after it had occurred. Pine Eagle's other school board members also did not learn about the drill until after it happened.

McLean tried to formulate a safety plan for her students and herself in the event of an active shooter coming into the building. She discussed this with Thatcher. McLean suggested that a vent in the classroom might be used to hide students or as a means of escape. Thatcher responded that the vent ran vertically from McLean's classroom to the roof of the building, so that it could not be used to provide student safety or a means of escape. She was still trying to formulate her safety plan when the unannounced active shooter drill occurred.

Superintendent Corley was traveling out of state on April 26 and was not present for the drill that occurred that afternoon. Although Corley did not participate in planning the drill, ECF 35-4 at 23, both deCastro and Thatcher told Corley about it before it occurred. Specifically, Thatcher told Corley that Thatcher and Minarich planned to enter the school building, discharge "starter" pistols, and observe the reaction of the teaching staff. ECF 38-1 at 39. Corley asked Thatcher if anyone had informed the teachers about the upcoming drill. Thatcher replied that the teachers were not going to be notified. *Id.* at 40. Corley does not recall being concerned that Thatcher and Minarich were going to use starter pistols, although he testified during his deposition that he thought the teaching staff should have been informed of the drill. *Id.*

On the afternoon of April 26, Minarich dressed in military-issue pants, t-shirt, vest, and boots. He drove to the Pine Eagle District Office to meet Thatcher. Thatcher wore a hooded sweatshirt. Both men donned paintball mask goggles to disguise their identities. Both Minarich and Thatcher carried firecrackers and starter pistols containing .22 blank cartridges. The starter pistols belonged to Pine Eagle and primarily were used for its track program.

Principal deCastro instructed the teachers to work on their safety plans in their classrooms. Minarich and Thatcher entered the building, and Thatcher lit a firecracker as soon as he went through the main entrance. Thatcher went down one hallway toward McLean's

classroom, and Minarich went down another hallway toward the school library. McLean was in her classroom alone, sitting at her desk reading emails, when she heard a loud bang.

McLean turned to her right. A masked man (Thatcher) had burst into her room. He was wearing black pants, a black hoodie, and paintball mask goggles. The masked man pointed a pistol (the starter pistol) at McLean, standing about twelve feet away from her. He pointed the gun straight at her. He pulled the trigger. When the trigger was pulled, it sounded like a real gun. Smoke came out of the gun. The man said, "You're dead." He then ran away.

McLean did not recognize Thatcher until sometime after he had pulled the trigger. Nor did she realize that the situation was merely a drill. The gun looked real to McLean, and she believed that she was going to die. Thatcher was only in McLean's classroom for a few seconds before he ran out.

After Thatcher left McLean's classroom, she walked toward the door and saw a student standing in the hallway outside her classroom. Although it was an in-service day, several children were present. McLean grabbed the student's arm and left the building. As several other teachers ran for the exit, two of them collided and one fell, hitting her knee. Another teacher wet herself during the drill.

In total, the drill took about ninety seconds. After the drill, Principal deCastro conducted a "debriefing" with the teachers, during which she handed out "red dots," cut out from construction paper to signify the number of "shots" that each teacher had received; for some teachers, she explained that the teacher had just been "killed" by one of the shooters. ECF 38-1 at 194-95. Thirteen out of the fifteen teachers present during the drill received red dots. McLean, a teacher at Pine Eagle since 1982, states that she now suffers from severe emotional distress and

post-traumatic stress disorder as a result of the unannounced shooter drill conducted on April 26, 2013.

On April 3, 2013—a few weeks before the drill—McLean had sent Corley a letter announcing McLean's retirement as of June 30, 2013. McLean later signed a one-year contract, for which she could reapply annually, to work half-time for Pine Eagle as a reading specialist. On May 8, 2013, McLean obtained a note from a nurse practitioner at the Pine Eagle Clinic in Halfway, excusing McLean from work until further notice. Due to her emotional distress, McLean has been unable to return to Pine Eagle. McLean submitted a worker's compensation claim on May 13, 2013, and settled the claim in March 2014.

Approximately one year after the drill, in June 2014, Alpine Alarm submitted a bid to Pine Eagle to upgrade the district's alarm system. One month later, in July 2014, Pine Eagle awarded the contract to Alpine Alarm. Minarich began working on that project in December 2014 and completed the system upgrade in March 2015.

## DISCUSSION

Plaintiff originally asserted four federal civil rights claims under 42 U.S.C. § 1983 ("§ 1983") against all Defendants, alleging violations of Plaintiff's constitutional rights. Plaintiff alleged violations of substantive due process, procedural due process, unreasonable seizure, and "failure to train." In her response to Defendants' motions for summary judgment, Plaintiff agreed to dismiss her procedural due process claim. ECF 38 at 17. Regarding Plaintiff's claim alleging "failure to train," Plaintiff asserts that Defendants are liable because they failed properly to train and supervise Defendants Thatcher, Minarich, and deCastro. Defendants respond that there is no freestanding "failure to train" claim under the Fourteenth Amendment (or any other constitutional provision). The Court agrees and dismisses Plaintiff's stand-alone claim of "failure

to train."[3] Plaintiff also asserts two Oregon common law claims: (1) intentional infliction of emotional distress; and (2) civil assault.

## A. Plaintiff's Claims Under § 1983: Substantive Due Process and Unreasonable Seizure

To establish liability under 42 U.S.C. § 1983, "a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012) (quoting *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011)). All Defendants move for summary judgment against Plaintiff's § 1983 claims on the basis that she cannot show a deprivation of any constitutional right.

### 1. Substantive Due Process

Plaintiff alleges that Defendants violated her Fourteenth Amendment right to substantive due process. "As a threshold matter, to establish a substantive due process claim a plaintiff must show a government deprivation of life, liberty, or property." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (quoting *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 948 (9th Cir. 2004)). After that, a plaintiff must show that the behavior of the government is the sort that "shocks the conscience," in a constitutional sense. *Id.*

In *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), the Supreme Court explained:

> As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and

---

[3] In *Flores v. County of Los Angeles*, 758 F.3d 1154 (9th Cir. 2014), the Ninth Circuit explained that a local government or an official in his or her individual capacity may be held liable under § 1983 based on inadequately training others when the local government or official "was deliberately indifferent to the need to train subordinates, *and the lack of training actually caused the constitutional harm or deprivation of rights*." *Id.* at 1158-59 (emphasis added). Thus, to invoke this theory of liability, a plaintiff must show there has been a violation of a plaintiff's constitutional rights caused by an inadequately trained person. Liability under § 1983 cannot be based on a stand-alone claim of "inadequate training."

> open-ended. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214,
> 225–226, 106 S.Ct. 507, 513–514, 88 L.Ed.2d 523 (1985). The
> doctrine of judicial self-restraint requires us to exercise the utmost
> care whenever we are asked to break new ground in this field. It is
> important, therefore, to focus on the allegations in the complaint to
> determine how petitioner describes the constitutional right at stake
> and what the city allegedly did to deprive [petitioner's decedent] of
> that right.
>
> A fair reading of petitioner's complaint does not charge the city
> with a willful violation of Collins' rights. Petitioner does not claim
> that the city or any of its agents deliberately harmed [petitioner's
> decedent].

*Id* at 125. In *Collins*, the Supreme Court rejected a claim that a municipality violated an

employee's right to substantive due process by failing to train or warn its employees about

known hazards in the workplace that fatally injured the plaintiff. Unlike *Collins*, here McLean

charges the school district with a willful violation of her rights and alleges that agents of the

school district deliberately harmed her. That, however, goes to the defendants' conduct. Under

§ 1983, before we even get to the question whether a defendant's conduct "shocks the

conscience," a plaintiff must show a protected liberty interest.

### a.  Whether There Is a Protected Liberty Interest

Plaintiff alleges that Defendants violated her "protected liberty interest in freedom from

assault and terror." ECF 1 ¶ 44.[4] Substantive due process, however, protects only certain

---

[4] Plaintiff labels her substantive due process claim as "State Created Danger/Failure to
Protect." ECF 1 at 9. Regarding the "state-created danger" doctrine, the Ninth Circuit instructs:

> It is . . . well established that, although the state's failure to protect
> an individual against private violence does not generally violate
> the guarantee of due process, it can where the state action
> 'affirmatively place[s] the plaintiff in a position of danger,' that is,
> where state action creates or exposes an individual to a danger
> which he or she would not have otherwise faced.

*Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (alteration in original)
(quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Serv.*, 489 U.S. 189, 197 (1989); *Wood v.*

"fundamental" liberty interests. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Plaintiff

cites no authority for the proposition that freedom from "assault and terror" is such a recognized

interest.

Substantive due process does afford protection to "a citizen's liberty interest in her own

bodily security." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (stating that

this interest is well established); *see also Ingraham v. Wright*, 430 U.S. 651, 673 (1977) (stating

that the liberty interest includes the right to be free from unjustified intrusions on personal

security). Courts have consistently found that government conduct that results in *physical injury*

or *bodily restraint* to a plaintiff can be sufficient to establish a deprivation of this liberty interest.

*See, e.g.*, *Ingraham*, 430 U.S. at 674 (finding a sufficient liberty interest when school authorities

restrain a child and inflict "appreciable physical pain"); *Rochin v. California*, 342 U.S. 165, 173-

74 (1952) (finding that forcible stomach pumping of a person being held in custody violates

substantive due process).

Plaintiff, however, does not argue that she has suffered physical pain or bodily injury.

Plaintiff, rather, argues that the psychological trauma and emotional distress she suffers as a

result of Defendants' actions constitutes a sufficient liberty interest. Plaintiff cites several

---

*Ostrander*, 879 F.2d 583, 589-90 (9th Cir. 1989)). In Plaintiff's Response, however, Plaintiff
states, "Where the state causes the harm directly, as here, the doctrine is *beside the point*."
ECF 38 at 49 (emphasis added). The Court finds that the doctrine is not applicable in this case
because Defendants' affirmative actions were the direct and only alleged cause of Plaintiff's
injury, whereas in state-created danger cases, the plaintiff's injury is caused by some force other
than the initial affirmative action of the state official. *See, e.g.*, *Munger v. Glasgow*, 227 F.3d
1082 (9th Cir. 2000) (holding that police officers could be liable for the death by hypothermia of
an individual that they ejected from a bar late at night when outside temperatures were below
freezing); *Penilla v. Huntington*, 115 F.3d 707 (9th Cir. 1997) (holding that police officers could
be liable for the death of an individual when they cancelled a request for paramedics and locked
him inside his house after finding the individual in grave need of medical care); *L.W. v. Grubbs*,
974 F.2d 119 (9th Cir. 1992) (holding that state employees could be liable for the rape of a
registered nurse assigned to work in the medical clinic of a custodial institution with a known
and violent sex offender and no one else).

out-of-circuit cases in support of her argument, including the Seventh Circuit's decision in *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979). In *White*, the Seventh Circuit considered whether a plaintiff stated a claim for violation of right to substantive due process when the plaintiff, a child, alleged psychological injury resulting from being abandoned by policemen on a highway at night. The court reasoned that "the protections of the Due Process Clause against arbitrary intrusions on personal security include both physical and emotional well-being" and reversed the district court's dismissal of the complaint. *Id.* at 385.

Other circuit courts have left open the question of whether purely emotional trauma, without accompanying physical injury, may implicate a constitutional liberty interest in bodily security. *See Domingo v. Kowalski*, 810 F.3d 403, 416 (6th Cir. 2016) ("We . . . can imagine a case in which evidence of serious psychological injury could support a Fourteenth Amendment substantive due process claim."); *T.W. v. Sch. Bd.*, 610 F.3d 588, 601-02 (11th Cir. 2010) (stating "we can imagine a case where an exercise of corporal punishment—even one that causes only psychological injury—might be so severe that it would amount to torture equal to or greater than the stomach pumping abuse condemned in *Rochin*") (quotation marks omitted); *Abeyta v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1257-58 (10th Cir. 1996) ("We are unwilling to hold that actions which inflict only psychological damage may never achieve the high level of 'a brutal and inhuman abuse of official power literally shocking to the conscience,' *Hall* [ *v. Tawney*], 621 F.2d [607, 613 (4th Cir. 1980)], necessary to constitute a substantive due process violation.").

In addition, some district courts have held, like the Seventh Circuit, that allegations of emotional trauma may be sufficient to provide the constitutional liberty interest needed to state a claim for violation of substantive due process. *See, e.g.*, *Maglaya v. Kumiga*, 2015 WL 4624884,

at \*7 (N.D. Ill. Aug. 3, 2015) (holding that a child stated a claim for violation of personal security where police officer shot the child's dog while standing only a few feet away from the child and her dog); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997) (taking a "broad view of the concept of harm" when children in state custody alleged severe abuse and neglect); *Seide v. Prevost*, 536 F. Supp. 1121, 1133 (S.D.N.Y. 1982) (holding that psychiatric patients alleging significant threats to their physical and mental safety stated a substantive due process claim because "deny[ing] recourse to the courts simply because physical injury has not yet occurred would manifest a callous disregard for the safety of psychiatric patients who are unable to protect themselves").

Defendants responded that these cases are factually distinguishable because all of these cases involve psychological harm inflicted either upon *children* or upon adults being held in official custody. Defendants correctly state that Plaintiff is an adult and was not held in official custody.

Plaintiff also attempts to bolster her argument with dicta from the district court's decision in *Sanchez v. City of Fresno*, 2014 WL 2042058 (E.D. Cal. May 16, 2014). In that case, the plaintiffs were current or former homeless residents of the City of Fresno. They allege that the City seized and immediately destroyed their personal property, including property necessary for survival, essential to health, and of personal and emotional value. *Id.* at \*1. The court granted the defendants' motion to dismiss the plaintiffs' § 1983 Substantive Due Process Claim. *Id.* at 12. McLean calls the Court's attention to the following paragraph in *Sanchez*:

> Plaintiffs also attempt to support their danger creation cause of action by arguing they suffered degradation which "caused deep emotional problems from which they HAD suffered to recur." Doc. 162 at 14 (emphasis in original). While at least one case recognizes that ***an emotional injury might sustain a danger creation claim***, the injury must nevertheless be serious. *See Chase*

> *v. Cnty. of Nevada*, 81 F. App'x 92, 93 (9th Cir. 2003) (plaintiffs,
> who were witnesses to a deadly attack at their place of
> employment, a state run inpatient facility for individuals with
> behavioral health problems, were so traumatized by event that they
> could not return to work). Proof of any such serious harm is
> entirely absent from this record.

*Id*. at 11 (emphasis added). Plaintiff argues that, as described in *Sanchez*, the referenced

unpublished decision from the Ninth Circuit in *Chase v. Cnty. of Nevada*, 81 F. App'x 92 (9th

Cir. 2003), supports Plaintiff's position that "an emotional injury might sustain a danger creation

claim."

The Court has closely examined the Ninth Circuit's memorandum decision in *Chase* and

concludes that *Chase* does not support the proposition attributed to it in *Sanchez*, at least in the

context of a federal civil rights claim. The lawsuit in *Chase* arose after a mental patient's deadly

attack on employees working for the Nevada County Behavioral Health Services Department

("BHS"). Two former employees of BHS filed a § 1983 civil rights claim against the County and

several BHS supervisors. The plaintiffs alleged that the County's policies put the plaintiffs in

danger, in violation of their substantive due process rights. The district court granted the

defendants' motion to dismiss, and the Ninth Circuit affirmed. In addition, the Ninth Circuit

observed, "Plaintiffs may have a valid claim under state law, but they do not have a federal due

process claim." *Chase*, 81 F. App'x at 93. The Ninth Circuit concluded its decision with the

following:

> The Due Process Clause should not be interpreted "to impose
> federal duties that are analogous to those traditionally imposed by
> state tort law." [*Collins*, 503 U.S.] at 128. This principle "applies
> with special force to claims asserted against public employers
> because state law, rather than the Federal Constitution, generally
> governs the substance of the employment relationship." *Id*.

*Chase*, 81 F. App'x at 93-94.

Accordingly, Plaintiff has not shown the type of government deprivation of her liberty that can support a claim for violation of her federal constitutional right to substantive due process. *See also Fruitts v. Union Cty.*, 2015 WL 5232722, at *5 (D. Or. Aug. 17, 2015) (finding that "emotional trauma absent appreciable physical injury does not implicate a constitutional liberty interest in personal security"). This is sufficient to dismiss Plaintiff's substantive due process claim, even without deciding whether Defendants' conduct "shocks the conscience," in a constitutional sense.[5]

### b.  Qualified Immunity and Municipal Liability

Even if Plaintiff had sufficiently supported a substantive due process claim, she still would have to overcome the hurdles of qualified immunity and satisfy the element necessary for municipal liability. Officials and employees of the government (including a school district) are entitled to qualified immunity from damages unless they violate a constitutional right that "was clearly established at the time of the alleged misconduct." *Ford v. City of Yakima*, 706 F.3d 1188, 1192 (9th Cir. 2013). Although "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), "an officer is entitled to qualified immunity unless existing case law *squarely governs* the case" at hand. *Mendez v. Cty. of L.A.*, 815 F.3d 1178, 1187 (9th Cir. 2016) (quotation marks omitted) (emphasis in original). Here, McLean has not identified any existing case law, nor has

---

[5] As discussed later in this decision, the Court finds that Plaintiff has established a genuine issue requiring resolution by a jury on her state tort claims of intentional infliction of emotional distress and civil assault. One of the elements of the claim of intentional infliction of emotional distress is that the defendant engaged in outrageous conduct, *i.e.*, conduct extraordinarily beyond the bounds of socially tolerable behavior. As an analytical matter, it is possible that conduct that meets this standard necessarily would also meet the standard for conduct that "shocks the conscience" in a constitutional sense when performed by a government actor. Because neither side briefed this specific question and because answering this question is not necessary for the Court to resolve the pending motions, nothing further will be said about this topic.

the Court been able to locate any, that "*squarely governs* the case." Thus, all individual Defendants would be entitled to qualified immunity.

Regarding the school district itself, a local government entity may be liable under § 1983, even if its individual employees are entitled to qualified immunity. *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1186 n.7 (9th Cir. 2002). Liability "may attach when an employee is acting pursuant to an expressly adopted official policy, longstanding practice or custom, or as a final policymaker." *Thomas v. Cty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003)). In addition, "a plaintiff may show that an official policymaker either delegated policymaking authority to a subordinate or ratified a subordinate's decision, approving the decision and the basis for it." *Hyland v. Wonder*, 117 F.3d 405, 414 (9th Cir. 1997) (citation and quotation marks omitted). McLean does not argue that any of the individual Defendants were acting pursuant to an expressly adopted official policy of Pine Eagle or any longstanding practice or custom. Rather, she argues that the school district is liable because it delegated final policymaking authority over safety matters to the Safety Committee that planned and implemented the active shooter drill.

Under Oregon law, a "district school board is authorized to transact all business coming within the jurisdiction of the district . . . . [and] district school boards have control of the district schools . . . ." Or. Rev. Stat. § 332.072. Defendants point to the fact that individual board members do not hold policymaking authority; rather, a majority of the school board must be present before the board can transact business, and an affirmative vote of a majority of members of the board is required to transact any business. *See* Or. Rev. Stat. § 332.055.

Plaintiff argues that at the January 14, 2013 school board meeting, the board delegated final policymaking authority over safety matters to the Safety Committee. Plaintiff argues that the Safety Committee's decisions were not constrained by any school board policy or subject to review by the board. Plaintiff adds that this case is similar to the facts in *Hyland v. Wonder*, 117 F.3d 405, *amended*, 127 F.3d 1135 (9th Cir. 1997). In *Hyland*, the plaintiff was a former volunteer juvenile probation worker who alleged that government officials violated his First Amendment rights when they retaliated against him for his criticisms of conditions at the juvenile detention center. *Id*. at 407. The plaintiff worked as a special assistant to the chief juvenile probation officer at the juvenile probation department. *Id*. The plaintiff reported directly to the supervising judge of the juvenile court. *Id*.

The plaintiff in *Hyland* argued that the court had been delegated final policymaking responsibility over matters in the juvenile probation department, and that the judges delegated their authority to terminate the plaintiff's volunteer employment to the chief juvenile probation officer. *Id*. at 414. In support of this argument, the plaintiff identified the deposition testimony of one of the judges in which the judge stated that the court left the internal management of the juvenile probation department to the chief juvenile probation officer and "attempted not to interfere." *Id*. at 415 (quotation marks omitted). The judge also testified that the court "did not formulate any policy concerning employees." *Id*. The Ninth Circuit reversed the district court's grant of summary judgment to the defendants on the *Monell* issue, reasoning that the judges in charge of the juvenile probation department delegated all internal management issues to the chief juvenile probation officer and that the chief juvenile probation officer exercised those delegated powers in terminating the plaintiff as his volunteer personal assistant. *Id*.

PAGE 18 – OPINION AND ORDER

In the pending case, however, the Court finds Plaintiff's comparison to *Hyland* unpersuasive. Unlike in *Hyland*, Plaintiff does not identify any evidence in the record that the school board delegated the management of all safety issues to the Safety Committee and "attempted not to interfere" with the Safety Committee's implementation of its management policies. No evidence exists that the school board expressly delegated to the Safety Committee the ability to plan and conduct training exercises. Nor does Plaintiff present evidence that the school board ratified the drill. Although deCastro and Thatcher notified Corley that the drill was going to occur, the Safety Committee did not inform the school board of the drill or ask the school board formally to approve of it. In fact, school board members Seal, Saunders, Johnson, and Butler all testified that they had no knowledge that the Safety Committee was planning an active shooter drill and that they did not learn about the drill until after it had already occurred. ECF 35-9 at 2, 35-7 at 2, 35-6 at 6, 35-8 at 2. *See Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (stating that "ratification requires, among other things, knowledge of the alleged constitutional violation"). In addition, Johnson testified that he would have expected, as a school board member, to have been notified and advised of the plan to conduct an unannounced active shooter drill before it occurred. ECF 38-1 at 297.

Thus, Plaintiff has not shown that the school board, which is the "official policymaker" for Pine Eagle under Oregon law, delegated final policymaking authority over safety matters to the Safety Committee or ratified the Safety Committee's decision to conduct the unannounced active drill. Accordingly, Pine Eagle cannot be held liable on a theory that the Safety Committee was acting as "a final policymaker." *See Thomas*, 763 F.3d at 1170.

### 2. Unreasonable Seizure

Plaintiff also alleges that Defendants violated her Fourth Amendment right to be free from unreasonable seizure. Defendants argue that the Fourth Amendment generally does not

apply in the non-criminal, non-investigatory context, and this case does not fall within the "administrative inspection" exception to this general rule. *See United States v. Attson*, 900 F.2d 1427, 1430-31 (9th Cir. 1990) (instructing that the Fourth Amendment applies to administrative inspections). Defendants also argue that even if Pine Eagle's active shooter drill was an "administrative inspection," Plaintiff cannot show that she was "seized."

The Ninth Circuit explains that "the issue of whether the [F]ourth [A]mendment applies to an instance of non-law enforcement governmental conduct requires us to decide ***whether that conduct was intended as a search or a seizure***, be it in the context of a criminal investigation or as an administrative inspection." *Id.* at 1431 (emphasis added). The seizure of a person occurs "when [a government official], by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the [official's] words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

Plaintiff cannot show that Thatcher's actions amounted to a show of official authority such that a reasonable person would not feel free to leave. Plaintiff gives great weight to the fact that Thatcher pointed a pistol (albeit a starter pistol) at her and pulled the trigger. The Court agrees with Plaintiff that this fact, in isolation, may weigh toward finding a seizure. *See Floyd v. City of Detroit*, 518 F.3d 398 (6th Cir. 2008) (finding that a uniformed police officer firing a weapon at the plaintiff was a show of authority). Thatcher's intent, however, was to simulate the actions of an ***unlawful*** active shooter. Thatcher was not dressed in a uniform, but in disguise, wearing a hoodie and a paintball mask goggles. The purpose of the drill was to test the "Run,

Hide, Fight" skills of the teachers, and not to restrict their freedom of movement. In fact, it was the stated objective of the drill that Plaintiff and the other teachers would run, hide, or fight.

Further, Plaintiff does not dispute that her interaction with Thatcher lasted only several seconds before he ran out of McLean's classroom and down the hallway. Thus, the Court holds, as a matter of law, that Plaintiff was not unreasonably seized because no show of authority occurred and a reasonable person would have felt free to leave under the circumstances. Accordingly, the Court dismisses Plaintiff's claim alleging a violation of her constitutional right to be free of unreasonable seizure.

**B. Supplemental Jurisdiction**

Defendants argue that the Court should not exercise supplemental jurisdiction over Plaintiff's common law claims if the Court dismisses Plaintiff's federal claims, noting that independent diversity jurisdiction is lacking. When a district court dismisses all claims over which it has original subject-matter jurisdiction, it may decline to exercise supplemental jurisdiction over claims arising under state law. *See* 28 U.S.C. § 1367(c)(3). "Dismissal of the federal claims does not deprive a federal court of the power to adjudicate the remaining pendent state claims." *Nishimoto v. Federman-Bachrach & Assocs.*, 903 F.2d 709, 715 (9th Cir. 1990).

This lawsuit was filed in April 2015, more than 14 months ago. Extensive discovery has been taken by all parties. It is now time to bring this dispute to resolution. The Court finds that the interests of judicial economy, convenience, fairness, and comity weigh in favor of exercising jurisdiction over Plaintiff's two common law claims.

**C. Plaintiff's State Tort Claims: Intentional Infliction of Emotional Distress and Assault**

Defendants move for summary judgment against Plaintiff's claims for intentional infliction of emotional distress and civil assault, arguing that Plaintiff cannot show a genuine issue of fact regarding certain elements of these intentional torts. Defendants also argue that

PAGE 21 – OPINION AND ORDER

under the Oregon Tort Claims Act ("OTCA"), all individual Defendants (*i.e.*, all Defendants

other than Pine Eagle and Alpine Alarm) must be dismissed from this action to the extent that

they were acting within the course and scope of their employment or agency duties with Pine

Eagle. In support, Defendants state that the OTCA provides the "sole cause of action for any tort

committed by officers, employees or agents of a public body acting within the scope of their

employment or duties and eligible for representation and indemnification" by the public body.

Or. Rev. Stat. § 30.265(2). In addition, Alpine Alarm moves for summary judgment against

Plaintiff's common law claims, arguing that Minarich did not have contact with Plaintiff during

the drill and, in the alternative, that Alpine Alarm cannot be held liable for Minarich's allegedly

tortious conduct. Finally, all Defendants argue that Oregon's workers' compensation law

provides Plaintiff's exclusive remedy for her alleged injuries.

### 1.    Intentional Infliction of Emotional Distress

A claim for intentional infliction of severe emotional distress has three elements. A

plaintiff must show:

> (1) that defendants intended to cause plaintiff severe emotional
> distress or knew with substantial certainty that their conduct would
> cause such distress; (2) that defendants engaged in outrageous
> conduct, *i.e.*, conduct extraordinarily beyond the bounds of socially
> tolerable behavior; and (3) that defendants' conduct in fact caused
> plaintiff severe emotional distress.

*House v. Hicks*, 218 Or. App. 348, 357-58 (2008) (citing *McGanty v. Staudenraus*, 321 Or. 532,

543 (1995)). "Because proof of intent is often indirect and evidence of psychic harm is usually

self-serving, proof of this tort largely turns on the second element, whether a defendant's conduct

is sufficiently outrageous." *Id.* at 358; *see also Campell v. Safeway, Inc.*, 332 F. Supp. 2d 1367,

1379 (D. Or. 2004) ("In the usual case, evidence which satisfies the extraordinary-transgression

element . . . will also create a fact issue regarding the intent element.") (citing *Buckel v. Nunn*,

133 Or. App. 399, 404 (1995); *Bodewig v. K-Mart, Inc.*, 54 Or. App. 480, 487-88 (1981)). One of the most important factors to consider when deciding whether a defendant's conduct is extreme and outrageous is "whether a special relationship exists between a plaintiff and a defendant, such as employer-employee . . . ." *House*, 218 Or. App. at 360.

Excluding Alpine Alarm, Defendants argue that no evidence exists that they intended to cause Plaintiff severe emotional distress or that they engaged in outrageous conduct. The Court disagrees. The Safety Committee intended to simulate an active shooter intrusion and deliberately did not notify the teaching staff about the drill beforehand in order to invoke a realistic response by the staff. Thatcher also notified local emergency services about the drill, presumably so that they would not respond if a member of the staff called 9-1-1, thereby showing that Thatcher anticipated that some teachers might attempt to call 9-1-1. Thatcher and Minarich dressed in disguises with masks so they would not be recognized, and they ran through the hallways of the school, lighting firecrackers and firing starter pistols loaded with blanks. Thirteen out of the fifteen staff members present were "shot" during the drill by either Minarich or Thatcher. Schmitt and deCastro testified that a reasonable response on the part of the staff could have been to fight back against Thatcher or Minarich. Based upon these facts, a reasonable jury could find that Defendants intended to cause Plaintiff (and others) severe emotional distress, or at least that they knew with substantial certainty that their conduct would cause such distress. A reasonable jury also could find that Defendants' actions were outrageous.

### 2.  Civil Assault

A claim for civil assault has two elements: (1) the defendant intended to either cause a harmful or offensive contact with the plaintiff, or cause the plaintiff apprehension that the defendant was going to cause an imminent harmful or offensive contact with the plaintiff; and (2) the plaintiff reasonably believed a harmful or offensive contact would occur. OREGON

UNIFORM CIVIL JURY INSTRUCTIONS NO. 40.01; *see also Restatement (Second) of Torts* § 21 (1965); *cf. Olsen v. Deschutes Cty.*, 204 Or. App. 7, 24 (2006) (defining assault as "an intentional attempt to do violence to the person of another coupled with present ability to carry the intention into effect") (quoting *Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 48 (1956)).

Excluding Alpine Alarm, Defendants argue that they are entitled to summary judgment on Plaintiff's claim for assault because no evidence exists to support Plaintiff's allegation that Thatcher intended for Plaintiff actually to fear that she was going to be shot. When Thatcher entered Plaintiff's classroom, he was masked and in disguise and not immediately recognized by Plaintiff. That was his intention. Thatcher then pointed a pistol (albeit a starter pistol) loaded with .22 cartridge blanks directly at Plaintiff. He pulled the trigger, which created a loud noise that sounded like a real gun. Smoke came out of the gun. He then said, "You're dead," and ran out of the room. ECF 38-1 at 249. In addition, the Safety Committee's intent was to make the situation appear realistic by simulating the conduct of two active shooters. A rational trier of fact could find that Defendants acted with sufficient intent to establish a claim for civil assault and that Plaintiff reasonably believed that harmful or offensive contact was imminent.

### 3.  The OTCA

All Defendants except Alpine Alarm argue that because Plaintiff's Complaint does not allege damages greater than the applicable damages limit under the OTCA,[6] she cannot maintain her tort claims against the individual Defendants acting within their capacities as employees or agents of Pine Eagle. In response, Plaintiff relies on Or. Rev. Stat. § 30.265(4), which provides, in part, that:

---

[6] The OTCA's statutory damage limit for a local public body such as Pine Eagle is $600,000 for causes of action arising on or after July 1, 2012, and before July 1, 2013, as is the case here. Or. Rev. Stat. § 30.272(2)(d).

> If an action under ORS 30.260 to 30.300 alleges damages in an
> amount greater than the damages allowed under ORS 30.271,
> 30.272 or 30.273, the action may be brought and maintained
> against an officer, employee or agent of a public body, whether or
> not the public body is also named as a defendant.

Plaintiff's Complaint, however, does not expressly allege a specific amount of damages.

Although Rule 8(a) of the Federal Rules of Civil Procedure requires that a pleading contain "a

demand for the relief sought," whether a plaintiff is required to plead the exact amount of money

damages is unclear, and cases are split on the question. The Court notes, however, that

Defendants could have requested in discovery or by motion that Plaintiff specify the amount of

damages that she seeks, but they did not. Based on Plaintiff's Complaint and the fact that it does

not allege a specific amount of damages, the Court is unable to apply Or. Rev. Stat. § 30.265(4)

as that statutory provision is written. *Cf. Kramer v. S. Or. Univ.*, 2013 WL 4782154, at *6 (D.

Or. Sept. 5, 2013) (finding that a public official was a properly-named defendant where the

prayer for relief exceeded the damages cap).[7]

Relatedly, Defendants' motion to substitute Pine Eagle as the sole school

district-affiliated Defendant is governed by a different subsection of the OTCA, Or. Rev. Stat.

§ 30.265(3). That subsection provides:

> If an action under ORS 30.260 to 30.300 alleges damages in an
> amount equal to or less than the damages allowed under
> ORS 30.271, 30.272 or 30.273, the sole cause of action for a tort
> committed by officers, employees or agents of a public body acting
> within the scope of their employment or duties and eligible for
> representation and indemnification under ORS 30.285 or 30.287 is
> an action against the public body. If an action is filed against an
> officer, employee or agent of a public body, and the plaintiff
> alleges damages in an amount equal to or less than the damages

---

[7] At the hearing held on June 30, 2016, the Court allowed Plaintiff orally to amend her Complaint to plead that she is seeking in excess of $600,000 against each of the individual Defendants. Thus, Plaintiff now may rely on Or. Rev. Stat. § 30.265(4).

> allowed under ORS 30.271, 30.272 or 30.273, the court upon
> motion shall substitute the public body as the defendant.

Because Plaintiff does not "allege[] damages in an amount equal to or less than" the statutory

damage limit, Defendants cannot rely on this subsection to support their motion to substitute

Pine Eagle for the individual school district-affiliated Defendants.

### 4.  Alpine Alarm

#### a.  Vicarious Liability

Alpine Alarm argues that it is entitled to summary judgment against Plaintiff's common

law claims because the company cannot be vicariously liable for Minarich's actions. An

employer, however, may be held liable for the tortious actions of its employees (including its

President) under the doctrine of *respondeat superior* when the employee acts within the course

and scope of his or her employment. *Minnis v. Or. Mut. Ins. Co.*, 334 Or. 191, 201 (2002).[8]

An employee acts within the course and scope of his or her employment when three

requirements are satisfied: (1) the act occurs substantially within the time and space limits

authorized by the employment; (2) the employee was motivated, at least in part, by a purpose to

serve and benefit the employer; and (3) the act is of a kind that the employee was hired to

perform. *Id.* This analysis focuses on whether the allegedly tortious act was the outgrowth of the

exercise of the employee's duties. *Harris v. Pameco Corp.*, 170 Or. App. 164, 173 (2000).

"Whether an employee has acted within the scope of employment at any given time generally is

a question for the trier of fact, except in cases where only one reasonable conclusion may be

drawn from the facts pled." *Fearing v. Butcher*, 328 Or. 367, 374 (1999).

---

[8] The *respondeat superior* doctrine applies to intentional, as well as negligent, torts.
*Fearing v. Bucher*, 328 Or. 367, 372 (1999).

At the January 2013 Pine Eagle school board meeting, Principal deCastro reported that she had met with Minarich in his capacity as an Alpine Alarm representative and that Minarich "pointed out that notification is very important, and the communication system in our schools is lacking." ECF 38-1 at 203. Also in early 2013, Thatcher and Minarich discussed installing a communications system at Pine Eagle, and Alpine Alarm actually submitted an estimate for such a system. ECF 38-1 at 160, 226. Although Pine Eagle decided at that time not to purchase communications system from Alpine Alarm, *id.* at 161, it did so later. In July 2014, about 15 months after the active shooter drill, Alpine Alarm was awarded a contract to upgrade Pine Eagle's alarm system. ECF 32-1 ¶ 8. A reasonable jury could infer that at least part of Minarich's motivation in planning the unannounced active shooter drill was to encourage Pine Eagle to upgrade its communications system and to demonstrate the need for such an upgrade.

Plaintiff identifies additional facts in the record that support this inference. The active shooter drill occurred during the time of day that Alpine Alarm is usually open for business; Minarich dressed for the drill at Alpine Alarm's place of business; and Minarich often communicated with members of the Pine Eagle school board and Safety Committee through his Alpine Alarm email address, ECF 38-1 at 205-10. In addition, Minarich drove to Pine Eagle for the active shooter drill in an Alpine Alarm truck. The Court finds that a rational trier of fact could find that Minarich's allegedly tortious actions were the outgrowth of the exercise of his employment duties as President of Alpine Alarm; that he was acting, at least in part, within the course and scope of his employment as President of Alpine Alarm when he planned and participated in the active shooter drill; and that his motives included, at least in part, the objective of benefitting Alpine Alarm. *See Harris*, 170 Or. App. at 173.

### b.  Direct Liability

Alpine Alarm also argues that it is entitled to summary judgment on Plaintiff's common law claims because the company cannot be directly liable for Minarich's actions. A business, however, may be directly liable for an intentional tort where: "(1) the tort is committed by a person or persons wielding the whole executive power of the corporation; and (2) the tortious acts were committed [o]n behalf of the corporation." *Harris*, 170 Or. App. at 172 (quoting *Walthers v. Gossett*, 148 Or. App. 548, 556 (1997)).

Alpine Alarm argues that it cannot be held directly liable for Minarich's allegedly tortious actions because Minarich only co-owns Alpine Alarm with his wife. According to Alpine Alarm, this fact of co-ownership prevents Minarich from wielding the "whole executive power" of the corporation. Alpine Alarm, however, cites no legal authority for this proposition, nor was the Court able to find any.

Minarich is the President and co-owner of Alpine Alarm. He is responsible for the company's day-to-day operations. ECF 32-1 ¶¶ 2, 4. As discussed above, a reasonable trier of fact could find that Minarich, in planning and executing the unannounced active shooter drill, was motivated at least in part by a purpose to serve and benefit Alpine Alarm. For those same reasons, a jury also could find that Minarich committed the allegedly tortious actions on behalf of Alpine Alarm and that his involvement was not related solely to his duties on the Safety Committee or as Chair of the school board. A genuine dispute of material facts exists as to whether Alpine Alarm can be held directly liable based on Minarich's allegedly tortious actions.

### c.  Joint Liability

Alpine Alarm further argues that it is entitled to summary judgment against Plaintiff's common law claims because Minarich had no contact with Plaintiff during the active shooter

drill. An individual (or an entity), however, may be subject to liability for the tortious conduct of another if he (or it):

> (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Granewich v. Harding*, 329 Or. 47, 53-54 (1999) (quotation marks omitted). Thus, "conspiracy to commit or aiding and assisting in the commission of a tort are two of several ways in which a person may become jointly liable for another's tortious conduct." *Id.* at 53.

Minarich was directly involved in planning the active shooter drill. ECF 35-4 at 23. Like Thatcher, Minarich dressed in a disguise for the drill to hide his identity. ECF 38-1 at 23. Minarich also discharged firecrackers and fired a starter pistol loaded with blanks while in the school. *Id.* at 28. Based on Minarich's degree of involvement in the planning and execution of the active shooter drill, a reasonable jury could find that Alpine Alarm, acting through Minarich, engaged in a conspiracy to commit intentional infliction of emotional distress and to commit assault or that Alpine Alarm, again through Minarich, aided and assisted in the commission of those torts.

### 5. Oregon's Workers' Compensation Law

Defendants also argue that Plaintiff's common law claims are precluded by Oregon's workers' compensation law. Subject to certain exceptions, the OTCA provides immunity from liability for "[a]ny claim for injury . . . of any person covered by any workers' compensation law" to "every public body and its officers, employees and agents acting within the scope of their employment or duties" with immunity. Or. Rev. Stat. § 30.265(6)(a). Under Oregon workers' compensation law, "[w]orkers who are injured in the course and scope of employment are

PAGE 29 – OPINION AND ORDER

entitled to receive certain benefits from their employers, and, with some notable exceptions, those benefits are exclusive of all other remedies that would otherwise be available to the worker." *Bundy v. Nustar GP, LLC*, 277 Or. App. 785, 2016 WL 1660841, at *1 (2016) (alteration in original) (quoting *Hanson v. Versarail Sys., Inc.*, 175 Or. App. 92, 95 (2001)).

Plaintiff does not dispute that Oregon's workers' compensation law generally applies to her claims and injuries. Rather, Plaintiff argues that two statutory exceptions also apply. These exceptions are: (1) Or. Rev. Stat. § 656.156(2), which permits an employee to bring an action against her employer for an injury that is covered by workers' compensation law if the injury results "from the deliberate intention of the employer of the worker to produce such injury"; and (2) Or. Rev. Stat. § 656.018(3)(a), which permits an employee to bring an action "[i]f the willful and unprovoked aggression by a person otherwise exempt under this subsection is a substantial factor in causing the injury."[9]

The Oregon Supreme Court instructs that in order for the "deliberate intention" exception to apply, the plaintiff must show that:

> the employer determined to injure an employee, that is, had a specific intent to injure an employee; that the employer acted on that intent; and that the worker was, in fact, injured as a result of the employer's actions.

*Bundy*, 2016 WL 1660841, at *5 (quoting *Kilminster v. Day Mgmt. Corp.*, 323 Or. 618, 631 (1996)). The worker also must show more than gross negligence or reckless disregard of the

---

[9] Under Or. Rev. Stat. § 656.018(3), in addition to the employer, the following individuals and entities also are exempt from liability, subject to certain exceptions:

> the employer's insurer, the self-insured employer's claims administrator, the Department of Consumer and Business Services, and [ ] the contracted agents, employees, partners, limited liability company members, general partners, limited liability partners, limited partners, [and the] officers and directors of the employer . . . .

consequences, although a specific intent to produce injury may be inferred from the circumstances. *See Kilminster*, 323 Or. at 630-31, 633.

Although the "deliberate intention" exception permits an employee to maintain an action against an employer, the "willful and unprovoked aggression" exception permits an employee to maintain an action against individuals or entities other than the employer, including other employees. *See McCallum v. Boise Cascade, LLC*, 2008 WL 4279810, at *16 (D. Or. Sept. 12, 2008) (stating that Or. Rev. Stat. § 656.018(3)(a) "does not apply to the employer, but instead applies to the possibility of liability on the part of contracted agents, employees, and the like"). In the second exception, "willful" means "'deliberately and intentionally.'" *Palmer v. Bi-Mart Co., Inc.*, 92 Or. App. 470, 476 (1988) (quoting *Virgil v. Walker*, 280 Or. 607, 611 (1977)). "Aggression" can be defined as "an offensive action or procedure; esp[ecially]: a culpable unprovoked overt hostile attack." *Id.* at 477 (alterations in original) (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 41 (1976)).

As discussed above, it is a jury question whether Defendants acted with the intent to cause the Pine Eagle teachers to believe that two active shooters were in the school firing real weapons. Minarich and Thatcher loaded starter pistols with .22 blanks and fired the pistols directly at staff members. At the end of the drill, thirteen out of the fifteen teachers present had been "shot" or "killed." One of the teachers wet herself as a result of the drill. In addition, at the time that the drill was planned and executed, Minarich was the Chair of the Pine Eagle school board and deCastro was Principal of the elementary school. Corley, the Pine Eagle Superintendent, knew of the drill before it occurred—including the fact that Minarich and Thatcher planned to use starter pistols.

Based on all of this conduct by Defendants, a reasonable jury could conclude that

Defendants acted with the deliberate intent to inflict emotional distress or cause apprehension of

imminent harm in order to motivate: (1) the Pine Eagle teachers to be better prepared in the

future for a real shooting situation; (2) the Pine Eagle school district to upgrade its

communications system; or (3) both. A reasonable jury also could conclude that Defendants' acts

of intentional aggression were a substantial factor in causing Plaintiff's injuries. Thus, there is a

jury question on whether these facts fall within an exception to Oregon's workers' compensation

law.[10]

### D.  Defendants' Motion to Strike Punitive Damages

All Defendants other than Alpine Alarm argue that Plaintiffs' request for punitive

damages should be stricken based on the OTCA. Plaintiff agrees that punitive damages are not

available for claims governed by the OTCA. *See* Or. Rev. Stat. § 30.269(1) ("Punitive damages

---

[10] Defendants also argue that the doctrine of election of remedies bars Plaintiff's state law claims, citing *Johnson v. Dave's Auto Center, Inc.*, 257 Or. 34, 42 (1970). *See id.* (stating that "if the Workmen's Compensation Board had allowed plaintiff's claim and had made an award of compensation . . . plaintiff would clearly have been barred from filing the present action"). More recent federal and state decisions in Oregon, however, have found that Oregon workers' compensation law does not preclude claims for intentional infliction of emotional distress because such claims come within the statutory exceptions. *See, e.g.*, *Campell*, 332 F. Supp. 2d at 1380 (holding that the Or. Rev. Stat. § 656.156(2) exception may apply to plaintiff's claim for intentional infliction of emotional distress); *McMellon v. Safeway Stores, Inc.*, 945 F. Supp. 1402, 1408 (D. Or. 1996) (holding that the Or. Rev. Stat. § 656.156(2) exception may apply to an intentional infliction of emotional distress claim); *MacCrone v. Edwards Ctr., Inc.*, 160 Or. App. 91, 99-100 (1999) (holding that an intentional infliction of emotional distress claim was not barred by workers' compensation law because a jury could infer that the defendant acted intentionally to injure the plaintiff), *decision vacated on other grounds by* 332 Or. 41 (2001); *Moustachetti v. State*, 122 Or. App. 598, 602-603 (1993) (holding that the plaintiff's "intentional tort claim is not 'covered' by the workers' compensation law, within the meaning of Or. Rev. Stat. 30.265(3)(a), because Or. Rev. Stat. 656.156(2) preserves his common law tort remedies and compels us to assume that the legislature did not enact a worker's compensation law regarding that claim"); *Palmer*, 92 Or. App. at 475-76 (holding that both Or. Rev. Stat. § 656.156(2) and Or. Rev. Stat. § 656.018(3)(a) applied to the plaintiff's claim for intentional infliction of emotional distress).

may not be awarded on any claim subject to Or. Rev. Stat. § 30.260 to 30.300."). This includes

the officer, employees, and agents of a public body. Or. Rev. Stat. 30.285(1). Plaintiff does not

argue that members of a public school board are not covered under the OTCA. Thus, the Court

need only consider whether Plaintiff may seek punitive damages against Alpine Alarm.[11]

Under Oregon law, punitive damages are allowed if the plaintiff proves "by clear and

convincing evidence that the party against whom punitive damages are sought has acted with

malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm

and has acted with a conscious indifference to the health, safety and welfare of others." Or. Rev.

Stat. § 31.730(1). In this case, a rational factfinder could conclude that Alpine Alarm, through

Minarich, acted with malice or reckless and conscious indifference. Thus, Plaintiff may seek

punitive damages against Alpine Alarm either vicariously or directly.[12]

---

[11] If Minarich acted only in his capacity as an officer or employee of Alpine Alarm, and not in his capacity as chair of the Pine Eagle school board, Plaintiff might be entitled to seek punitive damages against both him and his company. Minarich, however, in serving as the chair of the school board and on its *ad hoc* Safety Committee appears to be acting in a dual capacity, partly as agent of the public body and partly as an officer and employee of the private business Alpine Alarm. Because of the difficulty, and perhaps impossibility, of segregating his capacities, punitive damages may not be sought against Minarich. Whether this also presents an insurmountable problem for Plaintiff in seeking punitive damages against Alpine Alarm remains to be seen. The parties have not briefed this issue. Accordingly, the Court limits its present ruling that allows punitive damages to be sought against Alpine Alarm strictly to the arguments that have been raised by the parties.

[12] Alpine Alarm also argues that Plaintiff should be required to follow the procedures mandated in Or. Rev. Stat. § 31.725 for pleading punitive damages. Alpine Alarm is mistaken. That Oregon procedural statute does not apply in federal court, even in diversity cases. *Burkhart v. L.M. Becker & Co.*, 2004 WL 1920196, at *2 (D. Or. Aug. 26, 2004) ("Although ORS 31.725 may have applied to this case when it was initially filed in state court, it does not apply now that the case is removed to this court. Instead, in federal diversity cases such as this one, the Federal Rules of Civil Procedure govern."); *Pruett v. Erickson Air-Crane Co.*, 183 F.R.D. 248, 250-52 (D. Or. 1998).

## CONCLUSION

Defendants' motions for summary judgment (ECF 32 and ECF 34) are GRANTED IN PART and DENIED IN PART. All claims brought by Plaintiff under § 1983 are dismissed. Plaintiff may seek compensatory damages based on intentional infliction of emotional distress and civil assault against Defendants Pine Eagle, John Minarich, David Schmitt, Michael Corley, Cammie deCastro, Shawn Thatcher, and Alpine Alarm. Plaintiff's claims against all other Defendants are dismissed. Plaintiff may seek punitive damages based on intentional infliction of emotional distress and civil assault only against Defendant Alpine Alarm.

**IT IS SO ORDERED**.

DATED this 1st day of July, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge